## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| EDWARD SLAVIN, R06833; MARNI K. YANG, R87186; MATTHEW LUGARDO, Y54027; RAYMOND SERIO, B70625; and MARK WINGER, K97120, on behalf of themselves and all similarly situated individuals,<br><br>Plaintiffs,<br><br>vs.<br><br>LATOYA JA'NAE HUGHES, in her official and individual capacities as the Acting Director of the Illinois Department of Corrections,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 24 C 4742 |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Plaintiffs Edward Slavin, Marni Yang, Matthew Lugardo, Raymond Serio, and Mark Winger have sued defendant Latoya Ja'nae Hughes, the Acting Director of the Illinois Department of Corrections (IDOC). The plaintiffs allege that the IDOC fails to provide kosher meals and that the meals provided to prisoners on the kosher meal plan are nutritionally inadequate. They seek injunctive and declaratory relief under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc-1(a), and under the Free Exercise Clause of the First Amendment via 42 U.S.C. § 1983. The plaintiffs have moved to certify a class and a subclass under Federal Rule of Civil Procedure 23(b)(2). In her response, Hughes has moved to exclude opinion

testimony from declarations submitted by putative class members. For the reasons outlined below, the Court grants the motion to exclude in part, certifies the proposed class, and denies the motion to certify the proposed subclass.

## Background

The Court takes the following facts from the class certification briefing and the second amended complaint. In adjudicating a motion for class certification, a district court need not accept the allegations in the complaint as true. *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 675–76 (7th Cir. 2001). The court should instead "make whatever factual and legal inquiries [are] necessary under Rule 23." *Id.* at 676.

The IDOC operates twenty-eight adult correctional centers across Illinois. Dkt. 121-1 ¶ 8. The plaintiffs are incarcerated by the IDOC. They are Jewish, and Judaism requires that they consume only kosher food, food that complies with Jewish dietary law (kashrut). Kashrut originates in "the Torah (the first five books of the Bible), but most of the laws concerning what is kosher have developed through centuries of Talmudic debates (debates regarding the application of the principles contained in the Torah) and rulings by rabbinic scholars." *Ran-Dav's Cnty. Kosher, Inc. v. State*, 129 N.J. 141, 146, 608 A.2d 1353, 1355–56 (1992).

Jewish dietary law is "complex and exacting[,]" *id.* at 146, 608 A.2d at 1356, and "there is considerable disagreement" within contemporary Judaism "over what precepts or tenets truly represent the laws of kashrut." *Id*. at 147, 608 A.2d at 1356. Still, the parties agree on several broad principles: keeping kosher requires avoiding the consumption of certain non-kosher food (such as pork and shellfish) and ensuring that kosher foods are not contaminated by non-kosher foods by, for example, using the

2

same vessels or implements to cook prohibited and permissible foods.  *See* Pls.' Mem. in Supp. of Class Certification, Ex. 8 (IDOC Therapeutic Diet Manual, Kosher Diet) at 56–58.  Additionally, meat and dairy cannot be consumed together, and separate vessels and implements must be used to prepare meat and dairy.  *See id.* at 56.

Upon entering IDOC custody, prisoners are asked to identify their religion.  *See id.*, Ex. 6 (20 Ill. Adm. Code § 425.30(e)).  Jewish prisoners may request a kosher diet from the chaplain of the IDOC facility in which they are incarcerated.  *Id.*, Ex. 5 (IDOC Chaplaincy Handbook); 20 Ill. Adm. Code § 425.70(c).

The IDOC does not have kosher kitchens.  The parties generally agree on the nature of kosher food provided by the IDOC.  Under a master contract, the IDOC obtains sealed, shelf-stable kosher entrees from an outside vendor, M.J. Kelner.  Def.'s Resp. to Mot. for Class Certification at 8.  The plaintiffs refer to these meals as "hot trays."  *See* Pls.' Mem. at 7.  Hot trays are heated and served to kosher-keeping prisoners at lunch and dinner.  The hot trays range between approximately 300 and 600 calories, *see id.*, Ex. 12 (Kosher Food Labels), and prisoners receive one tray at lunch and another at dinner.  The plaintiffs and certain declarants allege that they cannot eat the hot trays for health reasons because of high sodium and preservative levels, which presumably are required to keep the meals shelf stable.  To provide additional nutrition at lunch and dinner, IDOC also provides a "cold tray" composed of foods like salad, bread, crackers, peanut butter, jelly, and/or fruit, which is typically served on a Styrofoam tray.  The IDOC does not serve hot trays with the kosher breakfast.  The kosher breakfast includes some variation of cold cereal, milk, hard-boiled eggs (which are prepared in IDOC kitchens), bread or bagels, crackers, peanut butter, jelly, and/or

3

fruit.[1]

The plaintiffs have submitted fifty-nine declarations from Jewish prisoners, most of whom have worked in IDOC kitchens. *See id.*, Ex. 13 (Putative Class Member Declarations). Prisoners working in the IDOC's kitchens prepare all meals, including kosher meals. The declarants have collective firsthand knowledge of the kitchens of many IDOC facilities, and they present scores of concerns with the preparation of kosher meals by IDOC. Among other things, the declarants state the following. When a kitchen runs out of a kosher food item, workers substitute non-kosher food items prepared in the non-kosher IDOC kitchens. Prisoners who work in the kitchens often use the same utensils, pots, pans, and ovens for kosher and non-kosher food items. The hard-boiled eggs served at breakfast, for example, are prepared in the same "kettles" used to cook non-kosher meat at other times. Sometimes workers use the same utensils to serve or prepare kosher and non-kosher food for the same meal, at times without washing the utensils. Additionally, when a kitchen does not have Styrofoam trays on which to serve a kosher cold tray, the cold trays are placed on the same trays used for general meals, which are not fully cleaned or sanitized between use and contain non-kosher food residue. And the same industrial can opener is employed for all kosher and non-kosher canned goods, which are a staple of the IDOC prisoner diet. Some declarations also explain that prisoners were served hot trays without their double-layered plastic cover. Finally, kitchen workers receive little to no training on the principles of kashrut, food sanitation, and hygiene.

---

[1] Danville Correctional Center apparently serves a kosher hot breakfast consisting of a cheese omelet, pancakes, or waffles. Def.'s Resp., Ex. 11 (Danville Kosher Menu and Nutritional Analysis).

Edward Slavin, the proposed class representative, is incarcerated at Dixon Correctional Center.  Pls.' Mem. at 4.  Slavin was previously held at the now-shuttered Stateville Correctional Center.  *Id.*  Slavin is Jewish.  He requested and was served a kosher diet at Stateville.  He brought a *pro se* lawsuit for damages and injunctive and declaratory relief, alleging violations of the RLUIPA and the Free Exercise Clause.  *See Slavin v. Tanner*, No. 20 C 1180, 2023 WL 5721184 (N.D. Ill. Sept. 5, 2023).  He argued that the kosher food at Stateville was nutritionally inadequate, not kosher, and overly repetitive.  The defendants moved for summary judgment.  The Court granted summary judgment for defendants on Slavin's RLUIPA claim, which was moot because he had been transferred from Stateville, and denied summary judgment on his Free Exercise claim.  The Court found genuine factual disputes regarding whether the Stateville kosher breakfast was kosher, whether the pre-packaged kosher lunch and dinner provided sufficient nutrition, and whether other foods on the cold trays were kosher. *See id.* at *3.  The parties settled the case in March 2024.

In June 2024, Slavin filed the instant suit regarding the claimed lack of nutritionally adequate kosher meals across IDOC facilities.  This suit also concerns an issue not addressed in Slavin's first lawsuit:  the alleged removal of prisoners from the kosher diet list based on their purchase of non-kosher commissary items.  IDOC staff monitor the commissary purchases of prisoners on the kosher diet list.  *See* Pls.' Mem., Ex. 5 (IDOC Chaplaincy Handbook) at 20 (describing how IDOC monitors compliance with religious diets, including "buying food items from commissary that are contrary to their religion's diet"); *see* Def.'s Resp., Ex. 7 (IDOC Administrative Directive 04.25.102) at 4 (requiring the Food Services Manager to "[c]omplete a monthly review of the

5

commissary purchases for all individuals in custody on approved religious diets").  The IDOC limits the number of certain commissary items, including popular kosher-certified items, that a prisoner may purchase.  *See, e.g.*, Pls.' Mem., Ex. 13, Decl. 4 ¶ 24; *id.*, Decl. 18 ¶ 8.  Kosher-observant prisoners therefore purchase non-kosher commissary items to trade with other prisoners for kosher items.  *See* Pls.' Mem. at 14.  Slavin alleges that the IDOC removed him from the kosher diet list because he purchased non-kosher commissary items to barter with other prisoners.  Although Slavin exhausted the IDOC grievance process on this issue, he has not been restored to the kosher meal plan.

The plaintiffs seek statewide declaratory and injunctive relief on behalf of a similarly situated class of kosher prisoners in the IDOC and a subclass of those prisoners removed from the kosher diet list because of non-kosher commissary purchases.  They assert claims under RLUIPA and the Free Exercise Clause.  "RLUIPA prohibits a 'government' from 'impos[ing] a substantial burden on the religious exercise of a person residing in or confined to an institution,' unless the 'imposition of the burden on that person' is (1) 'in furtherance of a compelling governmental interest' and (2) 'the least restrictive means of furthering that compelling governmental interest.'"  *Walker v. Baldwin*, 74 F.4th 878, 880–81 (7th Cir. 2023) (quoting 42 U.S.C. § 2000cc-1).  Similarly, prison officials violate the Free Exercise Clause if they "personally and unjustifiably place[ ] a substantial burden on [an imprisoned person's] religious practices."  *Thompson v. Holm*, 809 F.3d 376, 379 (7th Cir. 2016).  "A burden is unjustified if it is not reasonably related to a legitimate penological interest."  *Id.* at 380.  "[F]orcing an inmate to choose between daily nutrition and religious practice is a

substantial burden." *Id.*

The plaintiffs request an order prohibiting Hughes from denying Jewish individuals nutritionally adequate kosher meals and requiring the IDOC to: consistently provide nutritionally adequate kosher breakfast, lunch, and dinner to prisoners on the kosher meal plan; train individuals working in IDOC kitchens on Jewish dietary law; and train wardens and chaplains on their responsibility for accommodating religious diets under RLUIPA and the First Amendment.

In November 2024, Hughes moved to dismiss the third count of the second amended complaint, which sought indemnification under the State Employee Indemnification Act, 5 Ill. Comp. Stat. Ann. 350/1, *et seq.*, for any attorney's fees. *See* dkt. 49. The Court denied the motion because the parties agreed that the plaintiffs could obtain attorney's fees from the State if they prevailed. *See* dkt. 75.

In September 2025, the plaintiffs moved for class certification. The parties completed discovery related to class certification, including inspections of kosher meal preparation in six IDOC kitchens, in March 2026.

**Discussion**

The requirements for class certification are established by Rule 23 of the Federal Rules of Civil Procedure. "The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–701 (1979)). Rule 23 ensures that a departure from that usual rule is proper and that "the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate." *Id.* at 349. Before addressing whether the proposed class

7

and subclass fulfill the requirements of Rule 23, the Court turns to two preliminary matters:  the main class definition and Hughes's motion to exclude the plaintiffs' declarations from putative class members working in IDOC kitchens.

## A.    Main class definition

The plaintiffs seek certification of the following proposed class, entitled the "Main Class (Nutritionally Inadequate [K]osher Meals)":

> All Jewish prisoners who are now or will be incarcerated in adult correctional centers by the Illinois Department of Corrections and thus who are at risk of being denied nutritionally adequate kosher meals due to cross-contamination in the preparation and provision of kosher meals by non-kosher matter, including non-kosher food, non-kosher cooking surfaces, non-kosher cooking utensils or non-kosher cooking machinery (ovens, stoves, pots, pans, trays, bowls, etc.).

Pls.' Mot. for Class Certification at 1.  The proposed class period runs from the date that Slavin was transferred to Dixon, September 22, 2022, to the present.

"[A] district court has the authority to modify a class definition at different stages in litigation[.]"  *In re Motorola Sec. Litig.*, 644 F.3d 511, 518 (7th Cir. 2011).  "If the evidence calls into question the propriety of defining a class in a particular way, then the definition must be modified[.]"  *Fonder v. Sheriff of Kankakee Cnty.*, 823 F.3d 1144, 1147 (7th Cir. 2016).  A court may modify a proposed class definition *sua sponte* in ruling on a motion for class certification.  *See Craig v. Hughes*, No. 23 CV 02993, 2025 WL 1826099, at *7 (N.D. Ill. July 2, 2025) (collecting cases).

The class definition quoted above uses the broad term "[a]ll Jewish prisoners[,]" and as a result it might be understood to include all Jewish prisoners incarcerated by the IDOC, regardless of whether the prisoner has sought or will seek a kosher diet.  Pls.' Mot. for Class Certification at 1.  Not all Jews, however, keep kosher or keep kosher in

8

a manner that would lead them to request a kosher diet from the IDOC. *See generally* Def.'s Resp., Ex. 1 (Pew Research Center, Jewish Americans in 2020 (2021)) at 77 (reporting that 17% of Jews in the United States "keep kosher in their home[,]" varying from 95% of Orthodox Jews to 24% of Conservative Jews and 5% of Reform Jews). Only those Jewish prisoners who request a kosher diet from an IDOC chaplain "are at risk of being denied nutritionally adequate kosher meals[.]" Pls.' Mot. for Class Certification at 1.

Although the class definition could be more explicit, the plaintiffs evidently intended that the proposed class include only those Jewish prisoners who have sought or will seek kosher food. *See id.*; Pls.' Mem. at 16 ("Class membership is defined objectively, based on prisoners who[m] IDOC has designated as Jewish . . . who are receiving or have received the kosher diet during the specified time period of September 22, 2022 to the present."). To make this limitation on the class more apparent, the Court modifies the class definition to include the italicized phrase: "All Jewish prisoners who are now or will be incarcerated in adult correctional centers by the Illinois Department of Corrections, *who are receiving or will seek a kosher meal plan from the Department*, and thus who are at risk of being denied nutritionally adequate kosher meals due to cross-contamination . . . ." Pls.' Mot. for Class Certification at 1.

**B.     Motion to exclude**

Hughes seeks to exclude the plaintiffs' declarations from fifty-nine putative class members regarding the conditions in IDOC kitchens, dkt. 103-13, arguing that they constitute inadmissible expert testimony on Jewish dietary laws and nutrition by lay witnesses. The plaintiffs contend that these declarations are not intended as expert

testimony.

> Under Federal Rule of Evidence 702,
>
> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. The rule requires the trial judge to act as a gatekeeper and "ensure that an expert's testimony 'is not only relevant, but reliable.'" *Gilbert v. Lands' End, Inc.*, 158 F.4th 839, 848 (7th Cir. 2025) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)). Lay witnesses may provide opinion testimony only if it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. "[L]ay testimony may not be used to 'provide specialized explanations or interpretations that an untrained layman could not make if perceiving the same acts or events[.]'" *Feazell v. Wexford Health Sources, Inc.*, 140 F.4th 438, 444 (7th Cir. 2025) (quoting *United States v. Conn*, 297 F.3d 548, 554 (7th Cir. 2002)).

"When an expert's report or testimony is 'critical to class certification,' we have held that a district court must make a conclusive ruling on any challenge to that expert's qualifications or submissions before it may rule on a motion for class certification." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 812 (7th Cir. 2012). The Seventh Circuit encourages district courts to rule on motions to exclude prior to deciding class certification, to avoid considering unreliable testimony. *See id.*

10

Hughes observes that the prisoner declarations contain the declarants' opinions regarding whether the IDOC provides nutritionally adequate kosher meals as well as their observations of the conditions in IDOC kitchens.  For example, one declarant states:

> IDOC might claim that the cold trays are kosher, but they are not kosher. The cold trays are not sealed and the lettuce and vegetables that they put on the cold trays are allowed to be contaminated by other non-kosher foods being prepared in the kitchen, or kitchen staff are using the same cookware, surfaces and utensils to prepare both kosher and non-kosher foods.

Pls.' Mem., Ex. 13, Decl. 18 ¶ 17.  This statement includes observations regarding several facts about how the cold trays are prepared and an opinion that the cold trays are not kosher.  The declarant is Jewish and has worked in kitchens in facilities of both the IDOC facilities and the federal Bureau of Prisons, but the declaration does not provide further evidence of any qualifications to determine whether food, as prepared, is kosher.  *See id.* ¶¶ 4, 9, 11.

The laws of kashrut are specialized, Fed. R. Evid. 701, and the Court is not persuaded that "an untrained layman could . . . make" an assessment regarding whether food was prepared in a kosher manner "if perceiving the same acts or events" as a person trained on Jewish dietary laws.  *Conn*, 297 F.3d at 554.  Moreover, the content of these laws is contested, with differing opinions across both centuries of rabbinic scholarship and contemporary Jewish movements.  *See Ran-Dav's Cnty. Kosher*, 129 N.J. at 146, 608 A.2d at 1355–56.  *Compare* Def.'s Resp., Ex. 2 (Central Conference of American Rabbis Responsa, American Reform Responsa 128-131: Kashrut in Reform Judaism) (stating that "[t]he range of options [for observing kashrut] available to the Reform Jew is from full observance of the Biblical and Rabbinic

11

regulations to total non-observance"), *with id.*, Ex. 5 (Rabbi Sholem Fishbane, Understanding the Reliability of Kashrus Agencies) (explaining the stringent kosher supervision approach of the kashrut administrator of the Chicago Rabbinical Council, an Orthodox organization that provides kosher certification). The average person has little familiarity with this topic. Although kosher-observant Jews must have a working knowledge of kashrut and may effectively be experts, not every Jew keeps kosher or keeps kosher in the same way.

Much like the declaration quoted on the previous page, the other declarants do not explain how long they have observed kashrut and in what manner, nor how they were educated on Jewish dietary laws. Nor does it appear that any of the declarants is a rabbi or mashgiach (an observant Jew who ensures that a food service establishment is kosher). For these reasons, the plaintiffs have not demonstrated that any of the declarants "is qualified as an expert by knowledge, skill, experience, training, or education," Fed. R. Evid. 702, to render an opinion regarding whether prepared food items are kosher. Accordingly, the Court excludes the portions of the declarations that opine on whether food heated or prepared in the IDOC kitchens is kosher. The Court may, however, consider the declarants' perceptions of the conditions in the IDOC kitchens, which are based on their firsthand observations as kitchen workers.

As for nutrition, some of the declarations note that the kosher meals served by IDOC are high in sodium and preservatives and insufficient in size. *See, e.g.*, Pls.' Mem., Ex. 13,, Decl. 3 ¶ 6 (estimating that the IDOC serves prisoners receiving the kosher diet 1,500 calories per day). Hughes argues that without expert testimony on nutrition, the plaintiffs cannot carry their burden on class certification. But the plaintiffs

do not need an expert on nutrition so long as their contention is that the IDOC does not provide kosher food. "[F]orcing an inmate to choose between daily nutrition and religious practice is a substantial burden." *Thompson*, 809 F.3d at 379. If the IDOC does not provide kosher meals, Jewish prisoners must choose between religious observance and adequate nutrition, regardless of the nutritional sufficiency of the IDOC's kosher meals.

Hughes contends that without expert testimony, the plaintiffs cannot prevail at class certification because they lack evidence regarding the requirements of kashrut and the nutritional sufficiency of the IDOC's kosher menus. At this stage, however, the plaintiffs need not establish a likelihood of success or a genuine dispute of material fact regarding the merits. If a plaintiff satisfies the requirements of Rule 23, "the class *must* be certified, even if it is sure to fail on the merits." *Eddlemon v. Bradley Univ.*, 65 F.4th 335, 338 (7th Cir. 2023) (quoting *Simpson v. Dart*, 23 F.4th 706, 711 (7th Cir. 2022)); *see id.* at 341 (holding that district court did not err in rejecting sufficiency of evidence arguments at class certification). As for the requirements of Jewish dietary law, the Court may consider the two sides' shared understanding on basic principles of kashrut, such as prohibited animals and separation of the utensils and vessels used to prepare kosher and non-kosher food as well as kosher meat and dairy. *See* Pls.' Mem., Ex. 8 (IDOC Therapeutic Diet Manual, Kosher Diet) at 56–58. In sum, the principles of kashrut are not contested to such an extent that the Court must disregard them in ruling on the motion for class certification.

## C. Main class

Turning to the merits of the motion for class certification, a plaintiff must show

13

that a proposed class satisfies all four requirements of Rule 23(a):

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class; (3) the claims
> or defenses of the representative parties are typical of the claims or
> defenses of the class; and (4) the representative parties will fairly and
> adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These four requirements are commonly referred to as (1)
numerosity, (2) commonality, (3) typicality, and (4) adequacy. *Spano v. Boeing Co.*,
633 F.3d 574, 577 (7th Cir. 2011). In addition, a class must also satisfy the
requirements of one of three alternatives under Rule 23(b). *Id.* at 583. Plaintiffs must
establish each of Rule 23(a) and Rule 23(b)'s requirements by a preponderance of the
evidence. *Messner*, 669 F.3d at 811.

A court's assessment of the requirement for class certification under Rule
23 must be "rigorous" and may "entail some overlap with the merits" of plaintiffs'
case, *Wal-Mart*, 564 U.S. at 351 (cleaned up), but consideration of the merits for class
certification purposes must "be limited to those aspects of the merits that affect the
decisions essential under Rule 23." *Schleicher v. Wendt*, 618 F.3d 679, 685 (7th Cir.
2010); *see also Messner*, 669 F.3d at 823 (finding that "an argument that some class
members' claims will fail on the merits if and when damages are decided" is "a fact
generally irrelevant to the district court's decision on class certification"). "Rule
23 allows certification of classes that are fated to lose as well as classes that are sure to
win[.]" *Schleicher*, 618 F.3d at 686.

### 1.    Numerosity

The first requirement of Rule 23(a) is numerosity. "The key numerosity inquiry
under Rule 23(a)(1) is not the number of class members alone but the practicability of
joinder." *Anderson v. Weinert Enters., Inc.*, 986 F.3d 773, 777 (7th Cir. 2021).

14

Accordingly, plaintiffs must show "that it is extremely difficult or inconvenient to join all members of the class" based on "the nature of the action, the size of the individual claims, and the location of the members of the class or the property that is the subject matter of the dispute." *Id.* (quoting 7A C. Wright & A. Miller, *Federal Practice & Procedure* § 1762 (3d ed. 2011)). Though courts have emphasized that there is no magic number for establishing numerosity, the Seventh Circuit has "recognized that 'a forty-member class is often regarded as sufficient to meet the numerosity requirement.'" *Id.* (quoting *Orr v. Shicker*, 953 F.3d 490, 498 (7th Cir. 2020)); *see also Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 859 (7th Cir. 2017).

The proposed class easily satisfies the numerosity requirement. The plaintiffs suggest that there are approximately 388 "Jewish prisoners in IDOC custody who wish to keep kosher, but have been, or will be, denied nutritional kosher meals because of Defendant's practice." Pls.' Mem. at 17. IDOC data showing prisoners who currently and previously received kosher meals supports this number. *See id.*, Ex. 14 (IDOC Printout of Jewish Inmates in IDOC Custody).

Joinder of the claims of several hundred prisoners located in twenty-odd IDOC facilities across Illinois would be highly impractical. Bringing all of these prisoners before the Court at once would raise security concerns, and because they are incarcerated, the prisoners would face challenges conducting discovery and communicating with witnesses. Hughes does not contest that the class satisfies Rule 23's numerosity requirement.

**2.      Commonality**

To satisfy the commonality requirement of Rule 23(a)(2), the plaintiffs' claims

"must 'depend on a common contention' and '[t]hat common contention . . . must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Ross v. Gossett*, 33 F.4th 433, 437 (7th Cir. 2022) (quoting *Wal-Mart*, 564 U.S. at 350). Put differently, "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350 (quoting Richard Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)). "A court need find only a single common question of law or fact, but it needs to identify more than the fact that everyone suffered as a result of a violation of the same provision of law." *Orr*, 953 F.3d at 498.

As indicated, the RLUIPA and Free Exercise claims are governed by similar standards. "RLUIPA prohibits a 'government' from 'impos[ing] a substantial burden on the religious exercise of a person residing in or confined to an institution,' unless the 'imposition of the burden on that person' is (1) 'in furtherance of a compelling governmental interest' and (2) 'the least restrictive means of furthering that compelling governmental interest.'" *Walker*, 74 F.4th at 880–81 (quoting 42 U.S.C. § 2000cc-1). The Free Exercise Clause prevents prison officials from "personally and unjustifiably place[ing] a substantial burden on [an imprisoned person's] religious practices[,]" which includes "forcing an inmate to choose between daily nutrition and religious practice[.]" *Thompson*, 809 F.3d at 379–80.

The plaintiffs identify a series of common questions that they frame somewhat

16

differently across their motion for class certification, memorandum in support of class certification, and reply.  *See* Pls.' Mem. at 3 (presenting common questions of "(1) whether Defendant perpetuated a common manner to prepare and provide kosher meals to IDOC's Jewish prisoners; [and] (2) whether the manner and method of preparation and provision of kosher meals to Jewish prisoners resulted in cross-contamination with non-kosher matter thereby rendering the food non-kosher[.]"); *see also id.* at 19 (listing common questions relating to training of IDOC kitchen workers, preparation of kosher food, and governmental interests of IDOC).  In their reply, the plaintiffs distill the common question as follows:  "[t]he only common question relevant to the main kosher diet class is whether the religious kosher diets were exposed to cross-contamination due to Defendant's systemic practice."  Pls.' Reply at 6.

That question is common to the proposed class.  The question of whether IDOC systemically failed to ensure that kosher meals were in fact kosher (or, as the plaintiffs put it, were not cross-contaminated with non-kosher ingredients or cooking implements) "is capable of classwide resolution," and the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims."  *Wal-Mart*, 564 U.S. at 350.  Particularly because the plaintiffs are seeking declaratory and injunctive relief, the question here is appropriately about whether "a prison had a policy [or practice] that regularly and systemically" burdened the religious exercise of the plaintiffs as a "consistent pattern[.]"  *Phillips v. Sheriff of Cook Cnty.*, 828 F.3d 541, 557 (7th Cir. 2016); *see also Parsons v. Ryan*, 754 F.3d 657, 678–79 (9th Cir. 2014) (affirming certification of a class of thousands of prisoners "subjected to the medical, mental health, and dental care policies and practices of the" Arizona Department of Corrections

17

because "class members are as one in their exposure to a particular and sufficiently well-defined set of allegedly illegal policies and practices, rather than only in their advancement of a general Eighth Amendment legal theory").  The plaintiffs' proposed common question does not require examining the individual injuries of each class member.  Rather, it hinges on IDOC's practices and policies.

Evidence in the record already shows that there is likely a common answer to the plaintiffs' question.  A designated representative of the IDOC, Christopher Easton, admitted during a Rule 30(b)(6) deposition that the IDOC cannot prevent contamination of kosher and non-kosher food across its kitchens.  Easton is the lead chaplain at Danville Correctional Center and has served as an Interim Chief Chaplain for the IDOC. Easton Rule 30(b)(6) Dep., 10:9–11:13; Def.'s Sur-Reply, Ex. 1.  He testified that the IDOC cannot properly prepare kosher food:

- "Q:  As you sit here today, you said that you've tried to troubleshoot these issues with the local food service managers.  As you sit here today, do you have confidence that the food that's prepared and served according to the kosher menu has always been consistently kosher?  A:  No."  Easton Rule 30(b)(6) Dep., 175:15–175:21.
- "Q:  During the time that you have worked at the IDOC since 2012 to the present, has IDOC ever met that standard [for kosher food]?  A:  No, sir.  Q:  And you said it's not currently meeting the standard either.  Is that correct?  A:  Not in my opinion."  *Id.* at 176:5–176:11.

These admissions pertain to all kosher food across all IDOC kitchens, suggesting a common answer to the plaintiffs' question.

Additionally, fifty-nine IDOC kitchen workers attested to similar practices rendering purportedly kosher food non-kosher in various IDOC kitchens: Dixon, East Moline, Graham, Hill, Illinois River, Jacksonville, Lawrence, Lincoln, Menard, Pontiac, Robinson, Shawnee, Sheridan, Southwestern, Stateville, Vandalia, and Vienna. *See* Pls.' Reply at 7–8 (summarizing declarations). The declarants observed IDOC kitchen workers using the same utensils and vessels to cook kosher and non-kosher food, serving kosher prisoners food cooked on non-kosher grills, and serving kosher food on trays soiled by non-kosher food residue, as well as a lack of training on kashrut for kitchen workers. The number of declarations—nearly sixty, relative to a class of about 380, thus about fifteen percent of the class—is significant and suggestive of a systemic practice. *See Wal-Mart*, 564 U.S. at 358 (describing how forty accounts of racial discrimination in a class of 334 people helped demonstrate a company policy of discrimination in *Teamsters v. United States*, 431 U.S. 324 (1977), in contrast to reports of discrimination from one in 12,500 class members in *Wal-Mart*, which could not establish a companywide policy). The fact that the declarants describe similar practices across IDOC facilities is also significant. *See id.* (noting that affidavits reporting discrimination in 235 of Wal-Mart's 3,400 stores did not support a company-wide pattern). Although kosher food may become non-kosher in different ways across IDOC facilities, the Court need not assess the facts at that level of granularity. Plaintiffs have sufficiently established a common question subject to a common answer: whether IDOC systemically disregards or neglects Jewish dietary laws across its facilities.

The lack of training on Jewish dietary laws for IDOC kitchen workers further supports commonality. Another Rule 30(b)(6) witness, Quentin Tanner, the food service

19

program manager at Stateville Correctional Center, admitted that the IDOC provides almost no training to kitchen employees on Jewish dietary laws and that he has trained workers based on what he has read on the Internet. Pls.' Mem., Ex. 10, Tanner Rule 30(b)(6) Dep., 37:22–38:3, 38:7–38:9 ("Q: Have you received any training regarding kosher diet? A: Other than what I read, no. Q: What did you read? A: Just whatever's in the internet, what's on the article basically[.] . . Q: So you've learned about the rules of a kosher diet by reading articles on the internet? A: Yes."); *id.* at 40:6–40:8 ("Q: You haven't received training from chaplains? A: No. If I have a question, I'll ask them."). IDOC kitchen workers are apparently trained on kashrut by individuals like Tanner, and the kitchen workers go on to train one another. *See* Pls.' Reply, Ex. 4, Powell Rule 30(b)(6) Dep., 119:12–119:18 ("Q: You don't show [IDOC kitchen workers] the Therapeutic Diet Manual that has these guidelines. You just tell them what the menu is; you show them how to prepare it; and you tell them 'You're not supposed to contaminate food.'" That's the on-the-job training. Correct? A: Correct."); *see id.* at 353:3–353:6, 353:24–354:3 ("Q: [T]here's no written material, so we don't know exactly the specific nature of that on-the-job training. Correct? A: Correct. . . . if we're so lucky to get one of those [kosher-observant] workers to be our religious diet worker, that's – that's what we all would like to have."). It is difficult to imagine how IDOC kitchen workers could comply with complex Jewish dietary laws based on brief oral training from individuals who know what they know about kashrut by reading about it via the Internet. The lack of training across IDOC facilities is a commonality that further supports the existence of a systemic practice making class certification appropriate.

Hughes argues that there is no common question relevant to the plaintiffs' claims because of differences in the kosher diet preparation among IDOC's facilities. Hughes' argument is unavailing for two reasons. First, IDOC's Rule 30(b)(6) witnesses have testified that the IDOC does not serve fully kosher food to those on the kosher diet across its facilities. Although that testimony does not rise to the level of a judicial admission, *see A.I. Credit Corp. v. Legion Ins. Co.*, 265 F.3d 630, 637 (7th Cir. 2001), it is nonetheless significant evidence. The Rule 30(b)(6) testimony that IDOC cannot ensure it serves kosher food and does not meaningfully train its kitchen workers is also largely confirmed by the fifty-nine putative class member declarations. Second, given the nature of the plaintiffs' claims, differences in exactly how kosher food is mishandled across IDOC facilities are not material.

Hughes notes that each IDOC facility makes its own kosher menu. But all of the hot trays served by IDOC originate with M.J. Kelner, and the different rotations on which facilities serve hot trays, *see* Def.'s Resp. at 9, are largely immaterial to the issues in this case.[2] More meaningful is that different IDOC facilities serve different foods on the cold trays and make different substitutions when necessary. Although kosher food may become non-kosher in specific ways in various IDOC kitchens, the particular manner in which food served to a prisoner following a kosher diet is non-kosher matters little. The significant fact in this case is that the food is no longer kosher, not how it gets that way.

---

[2] There is one potentially relevant issue regarding the sequence in which trays are served: whether dairy trays are served after meat trays without sufficient time between meals to ensure separation of meat and dairy. *See* Easton Rule 30(b)(6) Dep., 177:17–177:20 ("[W]e're not ensuring the dairy requirements for the kosher menu diet, the hours, the duration between dairy and meat, is being met in every incident."); Pls.' Mem., Ex. 8 (IDOC Therapeutic Diet Manual, Kosher Diet) at 56 (describing the varying customs for waiting to eat meat after eating dairy).

21

The plaintiffs must still present crosscutting evidence regarding Jewish dietary law to resolve the common question of whether IDOC systemically failed to provide kosher meals. But the cited differences in facility menus and kitchen practices do not preclude a common answer to this question.

Hughes also argues that preparation of kosher food varies in each IDOC facility because of different kitchen architectures and institutional practices, with some facilities designating specific areas for the preparation of special diets. Menard Correctional Center, for example, has a designated kosher microwave and sink and kosher serving tools. *See* Def.'s Resp. at 10. Hughes goes on to assert that "[i]f Plaintiffs were correct regarding commonality, then inspections of the practices of a single Departmental kitchen would be sufficient to show whether nearly thirty *other* kitchens were providing appropriate kosher meals." *Id.* at 32.

Hughes has tread into dangerous waters with this point. In adjudicating Hughes's request during discovery to limit the number of IDOC kitchens to be inspected by plaintiffs' representatives under Federal Rule of Civil Procedure 34(a)(2), the Court made clear to Hughes that she could not simultaneously obtain a limitation on the number of kitchen inspections on the ground that they were an "undue burden but then . . . [argue that plaintiffs] only did three inspections and . . . only had a[n] [un]representative sample, we don't know what's happening anyplace else. That's not going to work. I'm not going to let it work. Because it would be completely grossly unfair for you to do that." Feb. 14, 2025 Hearing Tr. But now Hughes' argument essentially does exactly that. Hughes cannot have it both ways; having persuaded the Court that kitchen inspections should be limited, she cannot now effectively contend that

22

plaintiffs did not conduct enough inspections.  But even if this were not the case, the Rule 30(b)6) admissions of Chaplain Easton, Tanner, and Powell support that the plaintiffs' proposed common question can be answered in a common manner with respect to all IDOC facilities.

A class spanning multiple prisons is appropriate where plaintiffs "allege gross and systemic deficiencies (which may proceed on a classwide basis)" rather than "individual claims[.]"  *Scott v. Dart*, 99 F.4th 1076, 1090 (7th Cir. 2024), *cert. denied*, 145 S. Ct. 1166 (2025).  That allows a court to answer common questions together rather than based on "individualized questions of fact and law" where "the answers are unique to each [prisoner]'s particular situation."  *Phillips*, 828 F.3d at 551 (quoting *Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 498 (7th Cir. 2012)).  The Court concludes that the plaintiffs have shown the existence of a common question based on systemic practices sufficient to satisfy Rule 23(a)(2).

### 3. Typicality

Under Rule 23(a)(3), a "plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and [is] based on the same legal theory."  *Lacy v. Cook County*, 897 F.3d 847, 866 (7th Cir. 2018) (quoting *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992)).  The typicality requirement "is meant to ensure that the named representative's claims have the same essential characteristics as the claims of the class at large."  *Id.* (cleaned up) (quoting *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006)).

"[C]ommonality and typicality tend to merge."  *Scott*, 99 F.4th at 1091 (quoting *Priddy v. Health Care Serv. Corp.*, 870 F.3d 657, 660 (7th Cir. 2017)).  The typicality

23

"requirement may be satisfied 'even if there are factual distinctions between the claims of the named plaintiffs and those of other class members[.]'" *Id.* at 1091–92 (quoting *Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009)).

Slavin's claim is typical, as it arises from the same course of conduct generating claims by the other members of the class and rests on the same legal theory as those claims. *See Lacy*, 897 F.3d at 866. The class members assert the same violation of their rights under the First Amendment and RLUIPA based on IDOC's systemic failure to serve a genuinely kosher diet to those Jewish prisoners who request one.

Hughes contends that Slavin's claims, which rest on the kosher diet provided at Dixon, the facility where he was incarcerated throughout the class period, cannot be typical of the claims of others incarcerated at other facilities. But that is not so. The differences in how facilities prepare kosher meals are largely immaterial, as the Court has explained, because the core issue under the First Amendment and RLUIPA is not the specific manner in which a particular meal is non-kosher, but whether a Jewish prisoner observing kashrut is served kosher food. The plaintiffs' claims have the same "essential characteristics[,]" *id.*, even if the class members are incarcerated at different IDOC facilities.

Hughes also counters that the contamination of kosher meals at Dixon may have occurred due to negligence or mistake. But she presents no evidence suggesting this is so, and it is difficult to believe that Slavin's claims about Dixon's kitchen are anomalous given the Rule 30(b)(6) testimony and the stack of consistent declarations provided in support of the motion.

24

### 4. Adequacy

Fourth, plaintiffs must meet Rule 23(a)(4)'s adequacy requirement: "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The "adequate representation inquiry consists of two parts: (1) the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests, and (2) the adequacy of the proposed class counsel." *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011), *as modified* (Sept. 22, 2011). This inquiry "screens for conflicts of interest among class members because the same representative parties cannot adequately represent class members with divergent interests." *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 609–10 (7th Cir. 2021).

Hughes does not contest that Slavin is an adequate class representative and that his lawyers are adequate class counsel. The Court does not find any conflict between Slavin and the proposed class members. He "has claims and defenses typical of the class." *Westmoreland v. Hughes*, 144 F.4th 952, 955–56 (7th Cir. 2025). And he seeks injunctive relief on behalf of the class. Slavin capably represented himself in his first suit before the Court and has demonstrated commitment to ensuring prisoners can obtain kosher food within IDOC custody. He will be "able to monitor the conduct of counsel, who as a practical matter are the class's real champions." *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 954 (7th Cir. 2006).

Proposed class counsel Devlin Schoop and Steven Laduzinsky also fulfill the adequacy requirement of Rule 23(a)(4). Each has decades of litigation experience, and Schoop has a history of working with incarcerated clients and prior experience with

complex civil rights litigation. *See* Pls.' Mem., Ex. 15. The Court concludes, and the defendants do not dispute, that counsel for the proposed class have demonstrated their adequacy. *See* Fed. R. Civ. P. 23(g) (listing factors that courts must consider in appointing class counsel, including the counsel's work on the case, experience in complex litigation, "knowledge of the applicable law[,]" and "the resources that counsel will commit to representing the class").

### 5. Rule 23(b)

Finally, a class must satisfy one of the categories enumerated in Rule 23(b). The plaintiffs propose a Rule 23(b)(2) class, where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" Fed. R. Civ. P. 23(b)(2). "Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of cases in which certification under Rule 23(b)(2) may be appropriate. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997).

"Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Wal-Mart*, 564 U.S. at 360.

The plaintiffs seek a single injunction requiring IDOC, across its facilities, to provide nutritionally adequate kosher food to prisoners on the kosher meal plan; train individuals who work in IDOC kitchens on Jewish dietary law; and train wardens and chaplains on their responsibility for accommodating religious diets under RLUIPA and

the First Amendment.  This injunction would provide relief to each class member.  The putative class members are, of course, incarcerated in different IDOC facilities, and Hughes alleges that the differences in the kosher menus, kitchen layouts, and leadership between facilities preclude class-wide injunctive relief.  But as explained above, these differences do not appear to be material.  Moreover, relief targeted towards each facility's physical layout, menu, fiscal constraints, and leadership would be inappropriate.  "[F]ederal judges know little about the management of prisons[,]" and it likely would be inappropriate micromanagement for the Court to order relief at the granular level that Hughes imagines.  *Scarveu v. Litscher*, 434 F.3d 972, 977 (7th Cir. 2006).

**D.     Commissary purchases subclass**

The plaintiffs also seek certification of a subclass, specifically, one entitled "Sub-Class (Commissary Purchases/Backsliding)[,]" encompassing "[a]ll Jewish prisoners who have been or will be involuntarily removed from the Illinois Department of Corrections kosher diet on the basis of the prisoner's purchase of non-kosher food items at prison commissaries at adult correctional facilities."  Pls.' Mot. for Class Certification at  1.[3]  They allege that the IDOC monitors the commissary purchases of prisoners on the kosher diet list and removes individuals from the kosher diet based on their

---

[3] The plaintiffs employ the term "backsliding," quoting from *Reed v. Faulkner*, 842 F.2d 960, 963 (7th Cir. 1988), which used the phrase to refer to "[e]vidence of nonobservance[.]"  *Id.* ("[T]he fact that a person does not adhere steadfastly to every tenet of his faith does not mark him as insincere.  Some religions place unrealistic demands on their adherents; others cater especially to the weak of will.  It would be bizarre for prisons to undertake in effect to promote strict orthodoxy, by forfeiting the religious rights of any inmate observed backsliding, thus placing guards and fellow inmates in the role of religious police.").

purchase of non-kosher commissary items. *See* Pls.' Mem., Ex. 5 (IDOC Chaplaincy Handbook) at 20 (describing how IDOC monitors compliance with religious diets, including "buying food items from commissary that are contrary to their religion's diet"); *see* Def.'s Resp., Ex. 7 (IDOC Administrative Directive 04.25.102) at 4 (requiring the Food Services Manager to "[c]omplete a monthly review of the commissary purchases for all individuals in custody on approved religious diets").

The Court once again applies the requirements of Rule 23 outlined above.

### 1. Numerosity

Beginning with numerosity, the plaintiffs have the burden to show "that it is extremely difficult or inconvenient to join all members of the class" based on "the nature of the action, the size of the individual claims, and the location of the members of the class or the property that is the subject matter of the dispute." *Anderson*, 985 F.3d at 777 (quoting 7A C. Wright & A. Miller, *Federal Practice & Procedure* § 1762 (3d ed. 2011)). In their opening brief, the plaintiffs did not discuss the size of the commissary subclass. In addition to Slavin, *see* Pls.' Mem. at 10, only a handful of the fifty-nine declarants contend that they were removed from the kosher diet based on purchases of non-kosher commissary items. *See* Pls.' Mem., Ex. 13, Decl. 15 ¶ 23 ("I was involuntarily removed from the kosher diet for buying non-kosher food items at the commissary."); *id.*, Decl. 17 ¶¶ 7, 21; *id.*, Decl. 19 ¶¶ 6–7; *id.*, Decl. 50 ¶ 7.

Several other declarants make observations about the commissary purchases of individuals on the kosher diet. Some declarants observe that the IDOC may use a non-kosher commissary "purchase to involuntarily remove you from the kosher diet, accusing you of violating the kosher diet rules because you have consumed a non-

28

kosher food item." *See id.*, Decl. 4 ¶ 30; Decl. 5 ¶ 30.  But the declarants also explain that although trading commissary items is technically "trafficking and trading in contraband[,]" *Id.*, Decl. 3 ¶ 11, "[i]f I am discreet, the corrections officers will not issue disciplinary tickets for trading commissary items because they know we are just trying to eat food because we are hungry and not trying to cause trouble."  *See id.*, Decl. 3 ¶ 12; *see also, e.g.*, *id.*, Decl. 4 ¶ 27; *id.*, Decl. 5 ¶ 27; *id.*, Decl. 13 ¶ 27; *id.*, Decl. 14 ¶ 18; *id.*, Decl. 17 ¶ 12 ("IDOC rarely enforces the rule."); *id.*, Decl. 22 ¶ 16.  These prisoners have purchased non-kosher commissary items to trade for kosher food but have not been removed from the kosher diet as a result.  Many do not reference an IDOC practice of removing individuals from the kosher diet based on their commissary purchases, instead focusing on IDOC's practice of issuing disciplinary tickets for trading commissary items.  *See, e.g.*, *id.*, Decl. 14 ¶¶ 15–18.

These general statements are not sufficiently specific to support numerosity. They do not allow the Court to conclude that as many as forty individuals have been removed from the kosher diet based on their commissary purchases.  This evidence does not show that it would be impractical to join what may be a relative handful of plaintiffs who may assert the commissary-related claims.  *See Anderson*, 985 F.3d at 777.

After Hughes raised this argument in her response, the plaintiffs included with their reply a spreadsheet identifying over one hundred putative subclass members who were listed as "terminated" from the kosher diet, allegedly because of their non-kosher commissary purchases.  *See* Pls.' Reply, Ex. 10.  The spreadsheet includes a column entitled "Termination Reason," and the listed reasons include "CMPL OF JOB OR

ASSGN," "QUIT," "ERROR," "DETAINER," "NON-CMPL JOB OR ASSGN," "CHANGE SCHEDULE," "OTHER," "ROUTINE ASSIGN CHANGE," "DISC FROM IL CUSTODY." *See id.* The Court could not discern from the spreadsheet whether any of the terminations were due to non-kosher commissary purchases. To better understand this spreadsheet, the Court ordered Hughes to file a sur-reply. Dkt. 184. Hughes submitted a declaration from Chaplain Easton, who is familiar with the IDOC's religious diet program and the Offender360 technology from which this spreadsheet was generated, swearing that none of the ten different termination codes listed on the spreadsheet "specifically mean that an individual ceased to be eligible for kosher meals on the basis of commissary purchases." Def.'s Surreply, Ex. 1 ¶¶ 6–7.

For these reasons, neither the plaintiffs' declarations nor the spreadsheet provide sufficient evidence of numerosity with respect to the proposed subclass. As best as the Court can tell at this point, a small handful of prisoners have declared that they were removed from the kosher diet based on non-kosher commissary purchases. Joinder of these individuals to assert their claims would be feasible; at least, plaintiffs have not shown otherwise.

### 2.      Commonality, typicality, adequacy, and Rule 23(b)

The plaintiffs have, however, established the other Rule 23 elements with respect to the proposed subclass. They have presented a question common to the backsliding subclass, rooted in a common IDOC practice or policy: "whether Defendant perpetuated a practice to involuntarily remove Jewish prisoners from the kosher diet based on speculative assumptions that prisoners were not sincere adherents to Judaism because they purchased non-kosher food items from prison commissaries."

30

Pls.' Mot. for Class Certification at 2.  Assessment of the IDOC's policy on monitoring commissary purchases of individuals on the kosher diet and removing individuals from the kosher diet based on commissary purchases "is capable of classwide resolution," and the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims."  *Wal-Mart*, 564 U.S. at 350.

Slavin, the proposed subclass representative, has claims typical of the other members of the proposed subclass because his claim "arises from the same event or practice or course of conduct that gives rise to the claims of other class members and [is] based on the same legal theory."  *Lacy*, 897 F.3d at 866.

Hughes argues that Slavin is not an adequate representative of the subclass because he has successfully grieved his removal from the kosher diet, so his claim is moot.  "If an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit, at any point during litigation, the action can no longer proceed and must be dismissed as moot."  *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013) (cleaned up).  Hughes says that Slavin would not be an adequate class representative because he does not have "claims and defenses typical of the class." *Westmoreland*, 144 F.4th at 956.  Slavin has not, however, been returned to the kosher diet, which Hughes says is due to his failure to request kosher food from the IDOC.

Hughes concedes that Slavin has exhausted his claim under the Prison Litigation Reform Act.  *See* 42 U.S.C. § 1997e(a).  Yet Slavin has not received a kosher diet for thirty-two months *after* successfully exhausting the IDOC grievance process.  Pls.' Reply at 29.  IDOC points to no rule or regulation requiring a prisoner who has successfully grieved removal from a religious diet to affirmatively request reinstatement.

31

For these reasons, Slavin retains a personal stake in whether he is returned to the kosher diet, and he continues to suffer an injury. His claim is not moot, and it is not atypical of claims in the proposed subclass.

Finally, relief for the proposed subclass would be appropriate under Rule 23(b)(2), which requires showing that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" Fed. R. Civ. P. 23(b)(2). The prayer for relief does not specifically mention commissary purchases, but it asks the Court to enjoin Hughes from denying kosher meals to Jewish individuals who have a sincere desire to keep kosher. An injunction preventing Hughes from denying kosher meals to individuals on the sole ground that they have purchased non-kosher items would remedy the asserted injury. This relief does not require tailoring to the facts of any individual class member.

In sum, certification of the subclass is not appropriate at this time because the plaintiffs have not demonstrated that the subclass is sufficiently numerous. But because the plaintiffs have satisfied the other requirements of Rule 23, certification might be appropriate on a renewed motion supporting a finding of numerosity.

### Conclusion

For the foregoing reasons, the Court grants in part defendant's motion to exclude [dkt. 175], certifies the proposed main class, and denies the motion for certification of the commissary purchases subclass [dkt. no. 101]. As explained, the Court modifies the proposed class definition such that the certified class includes:

> All Jewish prisoners who are now or will be incarcerated in adult correctional centers by the Illinois Department of Corrections who are

32

receiving or will seek a kosher meal plan from the Department and thus who are at risk of being denied nutritionally adequate kosher meals, due to cross-contamination in the preparation and provision of kosher meals by non-kosher matter, including non-kosher food, non-kosher cooking surfaces, non-kosher cooking utensils or non-kosher cooking machinery (ovens, stoves, pots, pans, trays, bowls, etc.).

The class representative is Edward Slavin.  The Court appoints the plaintiffs' counsel of record, Devlin Schoop and Steven Laduzinsky of Laduzinsky & Schoop, P.C., as class counsel under Rule 23(g).  The Court sets the case for a telephonic status hearing on May 22, 2026 at 9:15  a.m. for the purpose of addressing the question of notice to the class, *see* Fed. R. Civ. P. 23(c)(2) ("For any class certified under Rule 23(b)(1) or (b)(2), the court *may* direct notice to the class.") (emphasis added), and setting a schedule for further proceedings, including a trial date.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  May 19, 2026